

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00099-CV

---

IN THE INTEREST OF A.P. AND
B.P., CHILDREN

----------

FROM THE 325TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 325-530796-13

----------

## MEMORANDUM OPINION[1]

----------

Appellant A.H. (Mother) appeals from the trial court's termination of the parent-child relationships between her two young daughters, A.P. and B.P., and herself. In her four issues, Mother challenges the sufficiency of the evidence to support the trial court's endangerment findings, the finding that she failed to support the children in accordance with her ability for a year ending within six

---

[1]*See* Tex. R. App. P. 47.4.

months of the petition's filing date, and the finding that she used a controlled substance in a way that endangered the children's safety and also failed to complete a court-ordered substance abuse treatment program. In her conclusion, Mother summarily challenges the sufficiency of the evidence to support the trial court's finding that termination of the parent-child relationships is in the children's best interests. Because we hold that the evidence is sufficient to support the judgment terminating the parent-child relationships, we affirm the trial court's judgment.

**Moot Complaints of Original Judgment**

Upon our abatement and remand of this case to the trial court, the trial court modified its written, ministerial judgment in a final judgment entitled "Order of Termination Nunc Pro Tunc" to more clearly reflect its rendition terminating Mother's parental rights to the children.[2] Consequently, to the extent that Mother complains of the differences between the rendition and the original termination order, we overrule those complaints as moot.

**Sufficiency of Endangerment Evidence**

In her first two issues, Mother contends that the evidence is insufficient (1) to show that she knowingly placed or knowingly allowed her children to remain in

---

[2]*See* Tex. R. App. P. 27.2; *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 206 (Tex. 2001) (stating that appellate court can abate the appeal to permit the trial court to clarify the intention of its order); *In re K.N.M.*, No. 02-08-00308-CV, 2009 WL 2196125, at *5–6 (Tex. App.—Fort Worth July 23, 2009, no pet.) (mem. op.).

conditions or surroundings which endangered their physical or emotional well-being and (2) to support the finding that she engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children.[3]   As we have explained in previous cases,

> Endangerment means to expose to loss or injury, to jeopardize.  The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child.   Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.
>
> The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child.  Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. Termination under subsection (E) must be based on more than a single act or omission . . . .
>
> To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury.  The specific danger to the child's well-being may be inferred from parental misconduct alone, and to determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth.  A mother's

---

[3]*See* Tex. Fam. Code Ann. § 161.001(1)(D), (E) (West 2014).

use of illegal drugs during pregnancy may amount to conduct that endangers the physical and emotional well-being of the child. A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being. Thus, parental . . . illegal drug use supports the conclusion that the children's surroundings endanger their physical or emotional well-being. A factfinder may also reasonably infer from a parent's failure to attend scheduled drug screenings that the parent was avoiding testing because the parent was using drugs. As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.[4]

A parent's abusive or violent conduct may likewise produce an endangering environment.[5] Because the evidence supporting the findings under subsections (D) and (E) overlaps, we consolidate our review of the sufficiency of the evidence supporting each finding.[6]

A.P. was born in June 2010. B.P. was born a few weeks prematurely in May 2012. She was born with her intestines outside her body. In June 2012, the Texas Department of Family and Protective Services (TDFPS) received a report from hospital staff that Mother and B.A.P. (Father) did not visit B.P. regularly or consistently during her hospital stay after her birth. Specifically, the hospital

---

[4]*In re J.W.*, No. 02-08-00211-CV, 2009 WL 806865, at *4 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.) (citations omitted).

[5]*In re A.I.T-A.*, No. 02-13-00164-CV, 2013 WL 5967029, at *3 (Tex. App.—Fort Worth Nov. 7, 2013, no pet.) (mem. op.); *In re I.C.W.*, No. 02-12-00226-CV, 2013 WL 173746, at *3 (Tex. App.—Fort Worth Jan. 17, 2013, no pet.) (mem. op.); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

[6]*See J.W.*, 2009 WL 806865, at *5.

report stated that Mother did not visit B.P. for two weeks, did not leave contact information with medical staff, and was not bonding with her. The report further alleged that both parents were using illegal drugs. The allegations were ruled unable to determine.

In October 2012, after the hospital released B.P. to her parents, TDFPS received a referral alleging medical neglect of B.P. because Mother did not take her to a scheduled doctor's appointment in September 2012 or respond to the doctor's office's calls or letters. Mother also refused Early Childhood Intervention even though B.P. was at risk of developmental delays. The allegations were ruled out.

In November 2012, Father dragged Mother by her hair across the courtyard of their apartment complex, causing injuries, and TDFPS received a referral. The referral included allegations of drug abuse, specifically, allegations of marijuana use by both parents and of Xanax abuse by Mother. The Child Protective Services (CPS) investigator testified,

> When domestic violence [occurs] between family members and the children are present in the home, especially children under the age of five, they are not able to protect themselves from danger. Anything could happen, a glass could be broken, a parent could accidentally hit a child. So it's very dangerous for children to be in an environment where domestic violence is going on.

Police officer Travis Bedare responded to the scene, and he testified that he saw Mother's bruised arms and visible injuries to her back. He further testified that domestic violence is dangerous to children. Bedare spent twenty to

5

thirty minutes asking Mother to leave the apartment with the children and to go to a shelter, but she refused.

TDFPS then opened a Family Based Safety Services (FBSS) case to offer the family services. An FBSS case operates without court involvement.[7]

Even though Mother refused to leave the apartment and move with the children to Safe Haven, she agreed to place the children with her mother (Grandmother) when TDFPS opened the FBSS case in November 2012. At that time, A.P. was almost two and one-half years old, and B.P. was about six months old.

The FBSS caseworker received the case from the investigator in November or December 2012. Mother agreed to participate in services, and the caseworker discussed the dangers of domestic violence to the children with her. Mother completed domestic violence group counseling but not individual counseling or an MHMR assessment, even though they were on her service plan. The FBSS caseworker testified that Mother did not benefit from the services because she had not made behavioral changes, as evidenced by the continuing pattern of domestic abuse and aggression between Mother and Father.

Officer Chris Allard testified that on May 11, 2013, he was called to Father's home because Mother reported that he had thrown a rock in her back

---

[7]*See* 40 Tex. Admin. Code § 700.705(b)(2) (2014).

6

windshield, breaking it. Father admitted that they had argued because Mother was not supposed to be there under the FBSS rules, but he denied that he had thrown a rock. The children, although present when the police arrived, were not in Mother's car. The police arrested Father. Allard opined that when parents are physically violent with each other or throw things, they create a dangerous environment for small children generally and that in this case, that was a dangerous environment for A.P. and B.P.

The FBSS caseworker testified that the parents repeatedly threatened to remove the children from Grandmother's home, that they broke FBSS's rules regarding supervised visits, and that TDFPS received third-party reports of the parents' drug use. Mother refused a drug test in January 2013, about two months after the FBSS case began. In April 2013, she tested positive for marijuana. In late June 2013, TDFPS filed its petition.

The domestic disputes, however, continued even after TDFPS filed its petition. Officer James Richie responded to a domestic disturbance at Mother's home in mid-September 2013. The children were not present. Mother reported that Father had kicked in her door and had wedged her up against the door frame. The officer testified that it appeared that the door had been kicked in with quite a bit of force. He further testified that Mother told him that she was afraid because Father had been violent in the past when he was angry.

In late October or early November 2013, Mother and Father had a verbal altercation at Target. He left her there. She reported that he had taken her car

7

keys. Father was ultimately arrested on outstanding warrants. Richie testified that Mother and Father had engaged in a pattern of domestic violence.

The drug abuse likewise continued after TDFPS filed its petition. Jim Turnage, President of Forensic DNA and Drug Testing Services, Inc., testified that Mother hair-tested positive for alprazolam and marijuana on February 13, 2014, but her urine test was negative. Mother told him that she had been given Xanax three weeks earlier in a hospital. We take judicial notice that alprazolam is marketed as Xanax.[8]

The FBSS caseworker testified that she believed that the children were in a dangerous environment when TDFPS filed its petition

> [b]ecause the parents continued with the domestic violence, the ongoing reports of the . . . angry outcries by [Father], not just to [Mother] but to other . . . persons as well, as well as the concerns of drug use that [TDFPS] received, as well as [Father's] admitting to using marijuana. And [TDFPS] didn't feel as though either parent was able to be protective or appropriately care for the children. And we do have two very young children, one with possible . . . medical issues. And [TDFPS] didn't feel as though [the parents], at that time, had made the necessary behavioral changes, although offered those services and completing some of them[,] to be able to keep the children safe and protected.

She also testified that the parents' threats to remove the children from their maternal grandmother's home were also a concern. The FBSS caseworker opined that if the parents had taken either child to the parents' home, that child would have been in a dangerous environment based on the patterns of domestic

---

[8]*See* Tex. R. Evid. 201(b).

8

violence and drug use, the parents' inability to protect or care for the two very young children, one of whom had possible medical issues, and the parents' lack of positive behavioral changes after completing some of the services offered them by TDFPS.

The licensed professional counselor who saw Father for several sessions testified that he saw Mother in only one joint counseling session and that she was argumentative, combative, and not interested in working with him or Father.

When Grandmother initially took physical custody of the children, she found B.P., who was six months old, lying nude on a urine-saturated blanket. Mother had no diapers and no clean clothes to dress her in. At that age, B.P. still could not roll over or sit up. The older daughter, A.P., had such severe bedbug bites that she still had scars at the time of trial.

Grandmother testified that Mother had left Father three different times and lived with her instead before the removal. Grandmother also testified that each parent had told her that the other one used drugs. She further stated that she had found Xanax in Mother's wallet and marijuana in a baby bottle in Mother's backpack when Mother was pregnant with B.P.

Grandmother also testified that in November 2012, Mother asked her to take custody of the two children so that Mother could move to Virginia to live with her father and get a "fresh start."

Grandmother saw the marks on Mother's body caused by Father's dragging her by the hair across the courtyard of their apartment complex.

9

Grandmother also testified that to the best of her knowledge, Father and Mother were living together at the time of trial. Grandmother testified that Mother's home was a "dangerous place."

Grandmother also testified that after the children were placed in her care, Mother had spoken inappropriately to A.P. on the telephone, calling her a "fucking brat" because she refused to tell Mother that she loved her.

The CPS conservatorship worker assigned to the case after the petition was filed testified that Mother and Father still tested positive for drugs in February 2014. She further testified that TDFPS usually wants the parents to have at least six months of sobriety before children are returned to them. The conservatorship worker testified that Mother and Father had an opportunity to achieve six months of sobriety but failed. The conservatorship worker also testified that Mother did not complete individual counseling or domestic violence classes although they were both part of her service plan. The conservatorship worker opined that the parents had not changed their behaviors; they still engaged in domestic disputes throughout the case. The conservatorship worker also pointed out that the parents arrived for their visits with the children together and left together, even though their visits were separate. The conservatorship worker testified that TDFPS believed that Father and Mother were together at the time of trial but that Mother admitted only that they were "talking."

The conservatorship worker stated that her concern was that if the children were returned to their parents' care, domestic violence in the children's presence

would continue. She also testified that Mother was not capable of permanently ending her relationship with Father to protect the girls and would place them in harm's way.

Father admitted that he and Mother used drugs and fought when they had their first child but contended that "it ha[d] passed" and that they "have been slowed down." Father testified that he, Mother, and others used cocaine after A.P. was born while she was also in the house. He denied that Mother used drugs during her pregnancies. He admitted that he and Mother had been living together for the three months preceding trial but stated that they had not fought during that period.

Father agreed that it is dangerous for children to be around drugs and domestic violence.

The trial court heard conflicting evidence regarding whether Mother used drugs during her pregnancies but also heard undisputed evidence that her drug use continued even after the petition for termination was filed. The evidence further showed that Mother continually returned to a bad relationship with Father fraught with domestic violence, both physical and emotional, and that she was living with him at the time of trial. The evidence additionally showed that Mother had neglected the medical needs of newborn B.P. Mother did not visit regularly or consistently while the baby was still in the hospital after her birth and did not take her to a scheduled doctor's appointment in September 2012 or respond to doctors' inquiries after the at-risk infant's release from the hospital. Mother also

11

neglected A.P.'s medical needs by allowing her to contract a severe bedbug infestation and injured her emotionally by calling her an obscene name because she would not tell Mother that she loved her.

Applying the appropriate standards of review, we hold that the evidence of Mother's drug use before and after TDFPS filed the petition to terminate; her frequent domestic disputes with Father coupled with her inability to permanently disengage from him to give the children a stable, safe environment; and her history of neglecting her young daughters is legally[9] and factually[10] sufficient to support the trial court's endangerment findings against her. We overrule Mother's first and second issues.

**Sufficient Evidence of Best Interest**

Mother's only statement in her brief regarding the best interest finding appears in the conclusion. She contends, "No factfinder could reasonably form a firm belief or conviction that the termination of the parent-child relationship was in the best interest of the children based upon the evidence offered in support of the grounds alleged." In the interest of justice as well as judicial efficiency, we will

---

[9]*See In re J.P.B.*, 180 S.W.3d 570, 573–74 (Tex. 2005); *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002) (together setting out standard of review for legal sufficiency).

[10]S*ee In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *In re C.H.*, 89 S.W.3d 17, 27–28 (Tex. 2002) (together setting out standard of review for factual sufficiency).

address the legal and factual sufficiency of the evidence to support the best interest finding.[11]

In addition to all the evidence detailed above, Grandmother testified that B.P. is still "followed for health issues" and will see the surgeon again a year after trial. Grandmother further stated that at the time of trial, the girls were caught up with their immunizations and dental work and were healthy.

Grandmother testified that she has a good relationship with Father's extended family and is willing to keep the children in contact with them. Grandmother testified that she would like to adopt the children, that she has the support of her two other adult children, that the children would not be safe if they were returned to their parents, and that termination of the parent-child relationships between the children and their parents is in the children's best interest.

Grandmother also testified that A.P. was upset before and after her weekly visits with Mother. A.P. had "bouts of urinating" and "w[o]ke up in the middle of the night" seeking comfort after the visits. On one occasion, A.P. told Grandmother that she was not happy because "her daddy hits her mommy."

The conservatorship worker admitted that the parents visited the children fairly regularly and that she had seen A.P. cling to Mother, asking her not to go at the end of weekly visits. But the conservatorship worker also testified that

---

[11]*See* Tex. R. App. P. 38.9.

Mother did not complete her support group and that she did not complete domestic violence class again after the petition was filed. The conservatorship worker further testified that there was no evidence of employment. She additionally testified that neither parent had asked TDFPS to investigate their home or employment status, nor had either parent told TDFPS of any long-term plan for caring for the children or ensuring their well-being. Finally, neither parent had ever asked how the children were doing outside of the regular visit. The conservatorship worker testified that termination of the parent-child relationships is in the children's best interest and that TDFPS's plan is for Grandmother to adopt the children. The conservatorship worker testified that TDFPS had no concerns with Grandmother's care of the children or her ability to protect them or to do what is appropriate and in the girls' best interest.

The children's guardian ad litem also recommended termination of the parent-child relationships and adoption by Grandmother.

Mother's fairly recent drug use and codependence on Father despite his violence toward her, even after TDFPS had already filed its petition to terminate, demonstrate the risks the children faced if returned to her care. Mother did not testify at trial; there was therefore no evidence about her plans, if any, for raising the children. Grandmother talked about her desire to adopt the children, the family support she had for doing so, and her recognition that the children also needed the stability of having their extended paternal family remain in their lives.

14

Neither TDFPS nor the children's guardian ad litem expressed any qualms about the children's welfare in Grandmother's custody.

Viewing all the evidence in the light most favorable to the finding and judgment and considering the nonexclusive *Holley* factors, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of the parental relationships between Mother and the children was in the children's best interests, and we therefore hold the evidence legally sufficient to support the trial court's best interest finding.[12] Similarly, reviewing all the evidence with appropriate deference to the factfinder, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of the parental relationships between Mother and the children is in the children's best interests, and we therefore hold that the evidence is factually sufficient to support the best interest finding.[13] We overrule Mother's contention that no evidence supports the best interest finding.

---

[12]*See* Tex. Fam. Code Ann. § 161.001(2) (West 2014); *J.P.B.*, 180 S.W.3d at 573–74; *C.H.*, 89 S.W.3d at 27; *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

[13]*See* Tex. Fam. Code Ann. § 161.001(2); *H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573–74; *C.H.*, 89 S.W.3d at 27–28; *Holley*, 544 S.W.2d at 371–72.

**Conclusion**

Along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination.[14] Because we have upheld the endangerment findings and the best interest finding, we do not reach Mother's third and fourth issues.[15] Having overruled Mother's issues challenging the findings on endangerment and best interests, which are dispositive, we affirm the trial court's judgment.

PER CURIAM

PANEL: DAUPHINOT, WALKER, and MCCOY, JJ.

DELIVERED: August 28, 2014

---

[14]*In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).

[15]*See* Tex. R. App. P. 47.1.